Arlynda **PODRAZA**, Appellee,

v.

The **CITY OF CARTER LAKE**, An Iowa Municipality, and **Gerald Waltrip**, As Mayor of the City of Carter Lake, Appellants.

No. 93–885.

Supreme Court of Iowa.

Nov. 23, 1994.

Michael J. O'Bradovich, Council Bluffs, for appellants.

Drew H. Kouris, Council Bluffs, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, SNELL, and ANDREASEN, JJ.

SNELL, Justice.

This is an appeal from a jury verdict awarding damages to plaintiff Arlynda Podraza for wrongful removal of her privacy fence. Compensatory damages were awarded against the City of Carter Lake and compensatory and punitive damages against Gerald Waltrip. We affirm.

### I. Factual Background

In October of 1989, Podraza purchased a home located within the bounds of the Carter Lake Club in Carter Lake, Iowa. At the time she purchased the residence, a chain-link fence surrounded it. The fence had been present at the location for at least thirty years and was in need of repair. Although Podraza believed the fence stood within the boundaries of her property, she was aware the fence was located on a city right-of-way which ran from the edge of a nearby boardwalk into her property for nine and one-half feet. The fence stood about one foot from the boardwalk.

Podraza decided to replace the old fence with a wooden privacy fence in part because she owned several large dogs and was concerned about children sticking their fingers through the chain links. Before beginning the new fence, Podraza obtained an application at the Carter Lake City Hall for permission to build a six-foot privacy fence. After a hearing on the matter, the board of adjustment unanimously approved the application. Podraza subsequently paid a fee and received a signed and stamped permit to build the fence.

She began construction of the new wood fence on April 7, 1990 and continued work on it the next day. Unable to finish the fence on April 8, Podraza and her workers decided to continue work during the weekend of April 21 and 22. Podraza estimated that the fence was two-thirds completed at the end of April 8.

On April 17, a Carter Lake police officer went to Podraza's home and delivered to her a letter from the Mayor of Carter Lake, Gerald Waltrip. The letter ordered her to cease construction on the fence because the board of adjustment had erred in granting her the permit to erect it. At trial, Podraza testified that she believed Waltrip did not

like her since he was a friend of her ex-husband and former mother-in-law.

In response to the mayor's action, Podraza attended a meeting of the Carter Lake City Council to request approval of a variance. At the April 25, 1990 meeting of the city council, the members reached a tie vote on the matter of Podraza's variance. She attended a subsequent May 9, 1990 meeting, and in this session, the council approved the variance by a vote of four to one.

Waltrip vetoed this city council resolution and a number of other resolutions which the council passed in favor of fences in the area. Waltrip then established a committee to study the fence situation in the country club area. Podraza testified that her former mother-in-law was one of the members of this committee and Podraza believed this adversely affected her chances of gaining approval from the committee.

On October 10, 1990, the committee reported that it would not approve Podraza's fence. The city council acted in accordance with the committee's decision and failed to approve the fence on this occasion but informed Podraza that she could have it if she placed it back on her own property. However, Waltrip vetoed the council's allowance of the fence even on Podraza's own property and the council subsequently sustained the veto.

In January of 1991, the City of Carter Lake passed an ordinance which stated that all existing fences could remain but required that any party seeking to build a new fence on any utility right-of-way or in the boardwalk area obtain permission from the city council. Podraza believed that this ordinance sanctioned the existence of her new fence, so she proceeded to complete it in July of 1991.

After learning of Podraza's activities, Waltrip telephoned her and told her that she was forbidden from having the fence. Shortly thereafter, city workers and police arrived at the scene intending to pull down the fence. The city workers brought a backhoe, truck, and at least one shovel which they intended to use to tear down the fence. Podraza testified that the chief of police, who she believed disliked her, informed her that neither the police nor any of the city workers brought any documents with them because such documents were not necessary.

Podraza stood in front of the fence, blocking the city workers, and the police informed her that if she continued to interfere, they would arrest her. Podraza testified that the police threatened to shoot her dogs if they got loose when the workers tore down the fence. While her cousin and brother stood between the workers and the fence, she went into her home and called a local television station and her attorney. This confrontation came to a peaceful end after Podraza's attorney and the city attorney spoke to each other and agreed to meet and consider the situation.

Podraza's attorney subsequently informed her that he and Waltrip had reached an agreement. Under this agreement, Waltrip stated that he would not interfere with Podraza's efforts if she could get two-thirds of her neighbors to sign a petition approving her fence and if she thereafter obtained approval from the board of adjustment. The agreement further required her to present the petition to the city council for consideration. Podraza testified that she was able to get substantially all of her neighbors to sign the petition. Her former mother-in-law, also a neighbor, was one individual who refused to sign.

After Podraza had acquired the signatures, Waltrip decided he would not honor the agreement because Podraza had had young children pass the petition from door to door. Waltrip felt he could ignore the agreement because he believed that its terms required that Podraza personally pass the petition around the neighborhood.

Despite Podraza's petition, Waltrip told city workers to go to her home and remove the fence. He also told the chief of police to go along to maintain law and order. On August 21, 1991 a city worker came to Podraza's door and informed her that under the authority of the city, he and a crew would begin tearing down the fence in one hour. The workers began tearing down the fence and Podraza attempted to stop them but the police officer told her that he would arrest her if she interfered. The workers proceed-

ed to tear down the west side of the fence. After cutting down the fence with a chain saw, the workers took the torn-down portion, other than the gate, to a city impound lot. Podraza testified that neither the police nor the workers carried any documentation when they tore the fence into several sections, and the chief of police appeared to be in charge of the operation.

In February 1992, without notice to Podraza, city workers returned with the wood sections now disassembled and dumped them onto her yard. The wood pieces were by then warped and some of the pieces had termites in them.

After the city tore down her fence, Podraza again went to the city council and it voted four to one in favor of allowing her to have her fence. Podraza testified that after this vote, Waltrip informed her he would not veto the council's resolution if she got the board of adjustment's approval. She subsequently attended a board of adjustment meeting in November of 1991 but the board denied her request by a vote of three to zero.

Podraza appealed the board of adjustment's decision to the Pottawattamie County District Court. The court ruled she could build a four-foot fence on property subject to a public easement and a six-foot fence on the rest of her property.

Podraza testified that she was so distraught over the situation with her fence that her family kept tabs on her. The problem with the city caused marital problems and her husband moved out. She put her Akita dog of fourteen years to sleep due to the lack of a fence. She gave the four other dogs she had on the property for five years to her parents who live in western Nebraska.

Podraza testified that she was intimidated by the police as a result of their threats to arrest her and by their comments about handcuffing her. The police told her they would shoot her dogs if they came at them, statements that were made in front of her children. Podraza also testified that Mayor Waltrip gave her an obscene gesture while driving his car past her on a public street and on another occasion threatened her by tailgating her car.

Podraza brought this action in the district court against the City of Carter Lake and Waltrip arguing that the removal of the fence was wrongful because: (1) it violated her civil rights guaranteed by 42 U.S.C. section 1983 (1993); (2) it amounted to conversion; and (3) it amounted to trespass. Following a trial, the jury returned a verdict in favor of Podraza on all grounds for recovery. At the close of all the evidence, Waltrip and Carter Lake moved for a directed verdict. The district court denied the motion and entered judgment in accordance with the jury's verdict.

Judgment was entered in favor of Podraza against the City of Carter Lake and Gerald Waltrip, jointly and severally, in the amount of $7000 for emotional distress with interest at ten percent per annum from February 14, 1992. Judgment was also entered in favor of Podraza against the City of Carter Lake and Gerald Waltrip, jointly and severally, in the amount of $1,938.69 actual damages for destruction of plaintiff's fence with interest at ten percent per annum from February 14, 1992. The court further entered judgment in Podraza's favor against Gerald Waltrip in the amount of $5,438.69 for punitive damages with interest at ten percent per annum from February 14, 1992. Finally, the court entered judgment for Podraza against all of the defendants for $145 for costs of this action and for $4522 in attorney's fees with interest at ten percent per annum from May 6, 1993.

## II.  Issues Appealed

On appeal before this court, Waltrip and Carter Lake raise six arguments. First, they argue Podraza may not bring an action under section 1983 because she had post-deprivation state remedies which she did not exhaust. Second, they assert that Iowa law renders Waltrip immune from liability for compensatory damages arising from conversion and trespass and therefore the trial court erred in instructing the jury on these issues. Third, Waltrip and Carter Lake argue the trial court should not have submitted the issue of mental injury to the jury because Podraza did not provide significant evidence of emotional distress.

The defendants' fourth contention is that the trial court should not have submitted the issue of compensatory damages to the jury because Podraza did not provide evidence of the fair market value of the fence at the time the city removed it. Fifth, Waltrip and the city argue that Podraza does not have a cause of action for conversion and trespass to chattels because the fence was located on a city right-of-way. Finally, the defendants argue that the trial court erred in instructing the jury on punitive damages because the parties should not have been held liable for compensatory damages and punitive damages may only be assessed against parties held liable for compensatory damages.

### III. Error Preservation

■ Our scope of review is for correction of errors at law. Iowa R.App.P. 4; *Pearson v. Ossian*, 420 N.W.2d 493, 494 (Iowa App.1988). We review a trial court's denial of a motion for directed verdict for correction of errors of law. *Spaur v. Owens–Corning Fiberglas Corp.*, 510 N.W.2d 854, 858 (Iowa 1994). Our review is limited to the grounds raised in the motion. *Id.; Bartels v. Cair–Dem, Inc.*, 255 Iowa 834, 845, 124 N.W.2d 514, 521 (1963); *see also McClaine v. Alger*, 150 Mich.App. 306, 388 N.W.2d 349, 352 (1986); *cf. Federal Land Bank of Omaha v. Woods*, 480 N.W.2d 61, 65 (Iowa 1992). We view the evidence in the light most favorable to the nonmovant and determine whether sufficient evidence existed to warrant submission of the issues to a jury. *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 684 (Iowa 1990). The review standard requires us to consider whether reasonable minds could differ on the issues in controversy. *Spaur*, 510 N.W.2d at 858.

Podraza argues that Waltrip and Carter Lake failed to raise any of the issues they present on appeal in their motions for directed verdict. Therefore, Podraza urges that Waltrip and Carter Lake failed to preserve any of their assignments of error for our review. The defendants respond with the following three arguments: (1) the defendants' answer to Podraza's petition preserved two of their appeal contentions; (2) since the motions for directed verdict alleged that suf-ficient evidence did not support any of Podraza's claims, this was adequate to raise all claims asserted on appeal; and (3) the law does not require parties to specify their arguments for directed verdict before the trial court in order for an appellate court to review the motion.

■ It is a basic tenet of law that an appellate court will not consider grounds for a motion for directed verdict which the movant did not place before the trial court. *See* 75A Am.Jur.2d *Trial* § 931, at 502–03 (1991). The sole exception to this tenet is that an appellate court will consider grounds not precisely raised in a motion for directed verdict where the record indicates the trial court, counsel, and both parties had no doubt what the grounds for the motion were and these grounds were obvious and discussed thoroughly in the court below. *Id.* at 503.

In support of their motions for directed verdict, Waltrip and Carter Lake raised five grounds before the trial court: (1) the ruling of the Pottawattamie District Court in Podraza's first action precludes her from claiming a right to build the fence and therefore she cannot maintain an action against Waltrip or Carter Lake because she cannot show their actions amounted to actual malice or a criminal offense; (2) Podraza cannot maintain a civil rights action because she failed to specify which civil rights the city allegedly violated; (3) Podraza cannot bring a due process challenge to the defendants' actions because she never established she had a right to a hearing; (4) Podraza failed to demonstrate a conspiracy between Waltrip and Carter Lake to disallow her fence; and (5) Podraza cannot seek punitive damages against Waltrip because she failed to prove actual malice or willful, wanton, and reckless conduct as Iowa Code section 613A.12 (1993) requires.

■ The defendants' initial argument upon appeal is that the trial court erred in failing to direct a verdict in their favor because Podraza could not properly sustain an action based on a violation of 42 U.S.C. section 1983. They assert Podraza could not maintain such an action because the due process rights she alleged were violated were actually procedural rights and she failed to exhaust

all post-deprivation remedies. The defendants did not raise this issue in their motion for directed verdict nor did they ever present it for the trial court's consideration. The defendants contend that they raised this issue in a paragraph in their answer which alleged the city's removal of the fence was not a "taking" within the meaning of the Iowa or United States Constitutions. This clearly is not the same issue and since the defendants did not give the trial court the opportunity to consider the argument they raise on appeal, we have nothing to review.

■ The defendants' second argument on appeal challenges the trial court's submission of the issues of conversion and trespass to the jury. The argument is that under Iowa law, the court could not hold Waltrip liable for compensatory damages based on the same theories of conversion and trespass asserted against Carter Lake. The defendants assert they presented this issue for the trial court's consideration in their answer when they stated "the fence which was removed by the City was on City property with no authority or color of authority being granted to this plaintiff." This is clearly not the same argument raised on appeal, and, again, the defendants have failed to preserve anything for our review.

■ A review of the defendants' motions for directed verdict and the entire trial court record demonstrates that the defendants failed to present the first four arguments they raise on appeal before the trial court. The defendants contend that the fact that they objected to the sufficiency of evidence supporting Podraza's claims in the trial court preserved any and all arguments they wish to raise against her claims on appeal. This stance is fundamentally contradictory to the function of an appellate court reviewing a trial court's application of the law. It is our function to review a trial court's consideration of arguments raised before it. *Spaur,* 510 N.W.2d at 858; *cf. Federal Land Bank,* 480 N.W.2d at 65. It is not our function to hear arguments counsel chooses to raise for the first time in this forum. *Spaur,* 510 N.W.2d at 858; *cf. Federal Land Bank,* 480 N.W.2d at 65.

## IV. Punitive Damages

On appeal, Waltrip and Carter Lake argue that the trial court erred in submitting the issue of punitive damages to the jury because Podraza's compensatory damage claims against both Waltrip and Carter Lake were untenable. The defendants contend that a court may award punitive damages against a party only if that party is liable for compensatory damages. The motion for directed verdict also contains a challenge to Podraza's punitive damage claims. In the motion, the defendants asserted that: (1) Carter Lake could not be liable for punitive damages because parties may not hold municipalities liable for punitive damages; and (2) the trial court could not properly hold Waltrip liable for punitive damages because Podraza failed to prove he acted with actual malice or willful, wanton, and reckless conduct as Iowa Code section 613A.12 requires.

■ We note here that while at one time Iowa law held that courts could hold individuals liable for punitive damages only if they were initially found liable for compensatory damages, *see, e.g., Rowen v. Le Mars Mutual Insurance Co. of Iowa,* 282 N.W.2d 639, 661 (Iowa 1979), this is not the current rule. Current Iowa law holds that an award of punitive damages does not depend on an award of compensatory damages, but rather depends on a showing of actual damages. *Suss v. Schammel,* 375 N.W.2d 252, 255 (Iowa 1985). Thus, there is no validity to defendants' punitive damage issue raised on appeal.

To support their implicit argument that Podraza did not suffer actual damages, the defendants rely on the first four arguments they have raised on appeal. Since the defendants did not properly raise these contentions in their motion for directed verdict, we are unable to consider them on appeal.

## V. General Contention

■ The general text of defendants' issues on appeal is that the evidence is insufficient to support the claims of plaintiff. Defendants state in their brief that their entire argument is that insufficient evidence was presented to the trial court to justify a ver-

dict for the plaintiff. Defendants state that this was the gist of the motions for a directed verdict and for the motion for judgment notwithstanding the verdict. In our review we consider the evidence in the light most favorable to the nonmovant. *Smith,* 464 N.W.2d at 684. In so doing, we find that the trial court did not err in submitting the issues to the jury.

VI. Attorney Fees

■ Attorney fees for trial were awarded to plaintiff Podraza; attorney fees for her attorney's services on appeal are requested. Defendants challenge both. Our law authorizes the award of such fees in cases involving 42 U.S.C. section 1983. *Willson v. City of Des Moines,* 386 N.W.2d 76, 85–86 (Iowa 1986); *Blessum v. Howard County Bd. of Supervisors,* 295 N.W.2d 836, 846 (Iowa 1980).

The itemized description of appellate services rendered by Podraza's attorney shows an expenditure of 54.8 hours for a charge of $5206. We hereby award judgment against defendants in favor of Podraza for her appellate attorney fees in the amount of $5206 and affirm the judgment for attorney fees for trial court services.

The judgments rendered in the trial court are affirmed.

**AFFIRMED.**