**Jay MENSINK and Lynn Mensink, Appellees,**

v.

**AMERICAN GRAIN and Related Industries, A Farmer–Owned Cooperative, Cargill Elevator, Inc., A Delaware Corporation, and Agri Grain Marketing, A Partnership and/or Joint Venture, Appellants.**

No. 95–2104.

Supreme Court of Iowa.

May 21, 1997.

Rehearing Denied June 16, 1997.

David J. Dutton and Carolyn A. Rafferty of Dutton, Braun, Staack, Hellman & Iverson, P.L.C., Waterloo; Robert G. Allbee of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines; and Gary D. Ordway of Patterson, Lorentzen, Duffield, Timmons, Irish, Becker & Ordway, Des Moines, for appellants.

James G. Sawtelle of Sullivan & Ward, P.C., Des Moines, and Tyrone P. Bujold and Mullen J. Dowdal of Robins, Kaplan, Miller & Ciresi, Minneapolis, Minnesota, for appellees.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and ANDREASEN, JJ.

LARSON, Justice.

Jay Mensink had just delivered a truckload of corn to the defendants' grain elevator when lightning struck the elevator and caused a grain dust explosion. Mensink received extensive injuries. He and his wife filed this suit, alleging several theories of recovery. The district court submitted two theories: failure of the elevator to install lightning protection devices and failure to evacuate the elevator before the explosion. The jury returned a verdict for the plaintiffs without specifying the theory under which damages were allowed. Because we conclude that it was error to submit the evacuation theory, we reverse and remand for a new trial.

## I. *Facts and Issues Presented.*

Agri Grain Marketing, a partnership composed of Cargill Elevator, Inc. and American Grain and Related Industries, leases a grain elevator located along the Mississippi River near McGregor, Iowa. This elevator is primarily composed of two structures, the original elevator and storage facility, or "old house," and an annex, which was built in 1978. On August 10, 1992, the lightning struck the elevator, igniting the accumulated grain dust.

The defendants raise four issues: (1) submission of the fire protection theory, (2) submission of the evacuation theory, (3) an accumulation of errors, and (4) the excessiveness

of the jury verdict. Because we conclude that the erroneous submission of the evacuation theory requires a new trial, it is not necessary to address issues three and four.

▇▇▇ The defendants challenged the court's submission of the two theories of recovery by motions for directed verdict and motions for judgment notwithstanding the verdict. We review a denial of a motion for a directed verdict for a correction of errors at law. *Podraza v. City of Carter Lake,* 524 N.W.2d 198, 202 (Iowa 1994). We review the evidence in the same light as the district court and determine whether a fact question was generated. *Frunzar v. Allied Property & Cas. Ins. Co.,* 548 N.W.2d 880, 884 (Iowa 1996). When reviewing the denial of a motion for a directed verdict or judgment notwithstanding the verdict, we view the evidence in the light most favorable to the nonmoving party. *Morgan v. American Family Mut. Ins. Co.,* 534 N.W.2d 92, 96 (Iowa 1995); *Podraza,* 524 N.W.2d at 202. We first address the issue of whether the court erred in denying the defendants' motions attacking the submission of the issue on the failure to provide fire protection devices.

## II. *The Fire Protection Theory.*

The defendants contend that it was error to submit this theory, primarily because (1) it rested on the testimony of a purported expert who was not competent to give an opinion; (2) the expert testimony should be rejected under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); and (3) the witness was improperly allowed to express an opinion on an ultimate fact.

▇▇▇ A. *The expert's qualifications.* The plaintiffs' case rests to a large extent on the testimony of Dr. Leonard Bernstein, who testified that installation of a lightning protection system would have reduced the chance of a lightning strike. The defendants attack his credentials, largely because of his lack of specific experience in grain elevator cases. As a general rule, decisions concerning a witness's qualifications are committed to the discretion of the trial court. *See Hutchison v. American Family Mut. Ins. Co.,* 514 N.W.2d 882, 885–89 (Iowa 1994)

(allowing a psychologist's testimony regarding head injury); *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch,* 497 N.W.2d 821, 827 (Iowa 1993) (citing *Ganrud v. Smith,* 206 N.W.2d 311, 314 (Iowa 1973)). "[T]he witness need not be a specialist in the particular area of testimony so long as the testimony falls within the witness' general area of expertise." *Hunter v. Board of Trustees,* 481 N.W.2d 510, 520 (Iowa 1992) (admitting expert testimony on corporate structure in general when witness's expertise was specifically in marketing management) (citing *State v. Peterson,* 219 N.W.2d 665, 673 (Iowa 1974)); *see also Thompson v. Bohlken,* 312 N.W.2d 501, 509 (Iowa 1981) (admitting expert testimony on safety of an industrial press when expert had general expertise in industrial manufacturing and industrial safety).

▇▇ Dr. Bernstein is a retired professor of electrical and computer engineering at the University of Wisconsin. He presently works as a consulting engineer on safety issues, including lightning damage protection. Since 1965 he has been extensively involved in the study of electrocution and electrical injury. For approximately thirty years, he has studied electricity and lightning as they relate to damage to persons and property. He has been a member of a lightning protection committee involved with the drafting of a code for lightning protection. He has worked with several manufacturers, the United States Consumer Product Safety Commission, and various firefighting agencies concerning issues of electrical and lightning protection.

Dr. Bernstein has organized programs at the University of Wisconsin to study lightning and lightning protection. Attendees from across the country have included lightning protection installers, representatives of government safety agencies, and representatives of insurance companies and fire departments. He has published articles on lightning safety and methods of preventing lightning injuries. He has been a member of the National Fire Protection Lightning Protection Committee and has assisted in revisions to the Lightning Protection Code published by the National Fire Protection

Association. He has consulted with Underwriters Laboratories on lightning protection equipment.

The court was well within its discretion in finding this witness to be qualified to testify.

B. *The admissibility of the evidence.* Iowa Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

■ This rule of evidence and our cases decided both before and after the adoption of the rule make it clear that we are committed to a liberal view on the admissibility of expert testimony, and we have been quite deferential to the district court in the exercise of its discretion in that area. *See, e.g., Williams v. Hedican,* 561 N.W.2d 817, 822 (Iowa 1997); *Hutchison,* 514 N.W.2d at 885; *State v. Hall,* 297 N.W.2d 80, 85 (Iowa 1980).

As to opinion evidence, we have stated:

Receipt of opinion evidence, lay or expert, is a matter within the trial court's discretion. We will not reverse the trial court's receipt absent a manifest abuse of that discretion to the prejudice of the complaining party. We are committed to a liberal rule on the admission of opinion testimony, and only in clear cases of abuse would the admission of such evidence be found to be prejudicial.

*Iowa-Illinois Gas & Elec.,* 497 N.W.2d at 827 (citation omitted); *accord Ganrud,* 206 N.W.2d at 314–15.

■ These defendants, however, ask us to "give ... guidance as to how trial courts are to discharge their increased responsibility" in view of the United States Supreme Court's *Daubert* case. Specifically, they say that, "[i]n light of *Daubert,* this court should revisit its standards for the qualification and admission of expert testimony." The effect of this revisitation, according to the defendants' analysis, would be to hold that the evidence here was inadmissible.

*Daubert* provided a two-part test for admission of expert testimony:

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. at 592–93, 113 S.Ct. at 2796, 125 L.Ed.2d at 482.

These defendants suggest that we apply the *Daubert* test and its "general observations" bearing on the admission of such evidence. These observations include (1) whether the theory can and has been tested, (2) whether the theory has been subject to peer review and publication, (3) what is the known rate of error, and (4) whether the theory has been generally accepted. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 482–83.

As we recently noted in *Williams,* 561 N.W.2d at 824, the *Daubert* analysis has been held not to apply to all cases involving expert testimony; rather, it is to be used as an aid in determining the reliability of proffered evidence of a complex nature. Using the language of rule 702, complex cases would usually involve "scientific" as opposed to those involving "technical or other specialized knowledge." *Williams,* 561 N.W.2d at 822; *see Compton v. Subaru of Am., Inc.,* 82 F.3d 1513, 1519–20 (10th Cir.) (limiting *Daubert* to unique, untested, or controversial methodologies), *cert. denied* 513 U.S. 862, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996); *Iacobelli Constr., Inc. v. County of Monroe,* 32 F.3d 19, 25 (2d Cir.1994) (finding error in applying *Daubert* to expert testimony regarding nonscientific evidence); *United States v. Muldrow,* 19 F.3d 1332, 1337–38 (10th Cir.) (applying conventional analysis to expert testimony respecting practices of drug traffickers while applying *Daubert* analysis to expert testimony of forensic chemist),

*cert. denied,* 513 U.S. 862, 115 S.Ct. 175, 130 L.Ed.2d 110 (1994); *Thornton v. Caterpillar, Inc.,* 951 F.Supp. 575, 577 (D.S.C.1997) (*Daubert* to be applied narrowly to controversial and novel scientific evidence). As we said in *Hall,*

> [d]eterminations of admissibility of such evidence must necessarily be made on an ad hoc basis, and it would be impossible to establish rules binding in every case. Obviously the complexity of the subject matter will influence the foundational showing of reliability. For example, the foundation for neutron activation analysis ... or polygraph evidence ... would require greater input from the scientific community than, for example, blow-ups of handwriting exemplars, ballistic comparisons, or tire tracks.

297 N.W.2d at 85 (citations omitted).

■ The "risk factors" considered by Dr. Bernstein are those that an average layperson would understand. These factors include (1) the type of structure, *e.g.,* a home, elevator, etc.; (2) the type of construction, *e.g.,* wood, reinforced concrete, etc.; (3) the topography of the surrounding area in relation to the structure; (4) the occupancy and contents of the structure, thereby affecting the degree of risk of injury or damage; and (5) the lightning frequency of the area (at McGregor, there are approximately forty to fifty "lightning days" per year, as compared to approximately 100 in Florida and less than five in the eastern United States).

These factors do not involve a highly complex matter of scientific evidence. *Daubert,* we believe, was not intended to apply in a case such as this one, and we decline to apply it here. The factors in this case, as set out above, which determine the vulnerability to lightning based on the type and location of the structure, are so "close to the ken of the average layman," *Hall,* 297 N.W.2d at 86, that a *Daubert* analysis would only complicate the court's decision regarding reliability. We know that it is dangerous to be in or near certain structures, or even trees, during lightning storms. We also know that, if we are in an area of high lightning frequency, we should be cautious, and that the height of the structures in relation to the surrounding terrain might attract lightning. In other words, Dr. Bernstein's risk assessment factors were not complicated or novel ideas or even foreign to a layperson's understanding about the phenomenon of lightning.

We conclude that, irrespective of *Daubert,* the witness sufficiently established the reliability of this evidence and that it would likely assist the fact finder in determining the facts in issue. *See* Iowa R. Evid. 702. The court therefore did not abuse its discretion in admitting it.

■ C. *The "opinion on the ultimate facts."* Dr. Bernstein testified, over the defendants' objection, that "the building was not reasonably safe without lightning protection on it" and that "[t]his explosion would not have occurred if there had been a properly installed lightning protection system." The defendants complain that this "was, in effect, an opinion that the defendants' conduct in maintaining [the elevator] did not meet the requisite standard of care" and that this was not a proper subject of expert testimony. They argue that it was tantamount to an opinion that the defendants were negligent.

In *Grismore v. Consolidated Products Co.,* 232 Iowa 328, 5 N.W.2d 646 (1942), a pivotal case expanding the scope of expert testimony, we dealt with the question of whether an expert's testimony will in effect amount to an opinion on whether the defendant was negligent. We said:

> There are many matters of scientific investigation and specialized knowledge in the fields of the professions, trades, business, industry, art, and other endeavors, where the minds of those not learned therein necessarily grope but blindly. Expert opinion in such cases is indispensable to aid the jurors in reaching a correct conclusion, and the fact that the matter inquired about is a vital and controlling fact in the trial, or is even the ultimate fact which the jury are to pass upon and determine, is no reason why the opinion should not be received.

*Grismore,* 232 Iowa at 343–44, 5 N.W.2d at 655.

Our rule of evidence 704 supports this view:

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

In *Iowa–Illinois Gas & Electric Co.,* 497 N.W.2d at 827–28, we held that it was proper for a witness to state standards promulgated by engineering professionals and to testify as to whether the defendant's conduct comported with those standards. *See also Grismore,* 232 Iowa at 361, 5 N.W.2d at 663 ("[C]ourts have permitted both scientific and practical experts to express their opinion whether a certain method used, or course of conduct was a proper one.").

In the present case, Dr. Bernstein testified based on the risk assessment discussed above that the building in question was at a "severe risk." He did not testify as to the jury's ultimate decision, *i.e.,* whether the defendants were negligent. He properly referred to the risk analysis promulgated by the technical committee on lightning protection of the National Fire Protection Association and concluded that the defendants failed to comply with it. The jury was free to disregard this testimony altogether, and the defendants were free to attack it on cross-examination or through rebuttal evidence of their own. We reject the defendants' argument that this constituted an improper opinion on an ultimate fact.

### III. *The Evacuation Theory.*

■ The district court submitted an instruction that permitted the jury to find that the defendants were negligent in failing to evacuate the elevator before the lightning struck. We do not know whether the jury found negligence on this theory or on the theory that the defendants were negligent for not having fire protection devices, or both. The verdict forms were, unfortunately, not structured to separate the jury's resolution of the two theories.

The law is that

[t]he possessor of land is under a duty to use ordinary care to keep the premises in a reasonably safe condition for business invitees. This duty requires the possessor to use reasonable care to ascertain the actual condition of the premises. The duty also requires the possessor to make the area reasonably safe or to give warning of the actual condition and risk involved. Restatement section 343 comment d [ (1964) ].

*Konicek v. Loomis Bros., Inc.,* 457 N.W.2d 614, 618 (Iowa 1990) (citations omitted); *accord Mundy v. Warren,* 268 N.W.2d 213, 217 (Iowa 1978) (quoting Restatement (Second) of Torts § 343).

■ We agree with the defendants that the plaintiffs failed to show a duty to evacuate the premises. Of course, in order to recover for damages caused by another's negligence, the plaintiffs must establish a legal duty. *Peters v. Burlington N. R.R.,* 492 N.W.2d 399, 401 (Iowa 1992). No statute, regulation, or ordinance requires that an elevator stop its operation and evacuate the premises when there is a threat of lightning. Furthermore, while the defendants' operation has been stopped during storms, it was not for the purpose of protecting persons on the premises. Rather, it was done to protect the personnel on the river working on barges and to protect electrical wiring in the elevator.

The plaintiffs showed no generalized customs that would require evacuation, and in fact, it is unlikely that there is a general custom that would require evacuation of the premises on forty or fifty days during the year (the number of lightning days in the McGregor area). Such a practice would be unworkable. Also, because the evidence showed that lightning can strike as much as twenty miles in advance of a storm, lightning strikes in some cases would be totally unpredictable.

■ Because we believe the plaintiffs failed to establish a duty to evacuate the premises, we hold that it was error for the court to submit this issue. We therefore reverse and remand for a new trial. Other issues are raised by the defendants, but we either find no merit in them or conclude that they are not necessary to the disposition of this case.

We affirm the district court insofar as it submitted the theory of failing to have proper lightning protection devices but reverse on the evacuation theory. We remand for a new trial.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR NEW TRIAL.**